UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID DEMARCUS HAQQ,

Petitioner,

v.

ROBERT NEUSCHMID,

Respondent.

Case No.  18-cv-06265-HSG

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Petitioner, a state prisoner incarcerated at California State Prison – Solano, has filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of a conviction obtained against him in state court.  Dkt. No. 16.  Respondent has filed an answer.  Dkt. Nos. 26–28.  Petitioner has filed a traverse.  Dkt. No. 40.  The Court has carefully considered the briefs submitted by the parties.  For the reasons set forth below, the petition is DENIED.

## I.  PROCEDURAL HISTORY

On May 23, 2013, an Alameda County jury convicted Petitioner of two counts of forcible rape while acting in concert (Cal. Pen. Code §§ 261(a)(2), 264.1), and one count of kidnapping to commit rape (Cal. Pen. Code § 209(b)).  The jury also found true the allegations that, in connection with the forcible rape counts, Petitioner kidnapped the victim, that the movement substantially increased her risk of harm, and that the victim was 14 years of age or older (Cal. Penal Code §§ 667.61(d)(2), 667.8).  Answer, Ex. 1 ("CT")[1] at 580-82.  On June 21, 2013, Petitioner was sentenced to state prison for a total term of 41 years to life.  CT 607-12.

On appeal, Petitioner argued that pre-charging delay denied him his federal and state

---

[1] The exhibits to the Answer are docketed at Dkt. Nos. 27 and 28.

1    constitutional rights to due process; raised a number of fair trial issues based on the emotional

2    testimony of the victim, including prosecutorial misconduct, ineffective assistance of counsel, and

3    failure of the trial court to reasonably control the proceedings; challenged the trial court's refusal

4    to allow him to recall the victim to the stand as a violation of his federal constitutional rights to

5    due process, to confront his accuser, and to present a complete defense; and argued that his

6    sentence constituted cruel and unusual punishment under both state and constitutional law.

7    Answer, Ex. 3. On April 3, 2017, the California Court of Appeal found no reversible error in any

8    of Petitioner's claims and affirmed Petitioner's conviction. *People v. Haqq*, C No. A139061, 2017

9    WL 1210013 (Cal. Ct. App. Apr. 3, 2017).

10       On May 3, 2017, Petitioner filed a petition for review with the California Supreme Court,

11    which was denied on June 28, 2017. Answer, Ex. 7.

12       On or about October 12, 2018, Petitioner commenced the instant federal action for a

13    petition for a writ of habeas corpus. Dkt. No. 1. The operative petition in this action was filed on

14    or about April 11, 2019. Dkt. No. 17.

## II. BACKGROUND

16       The following factual and procedural background is taken from the April 3, 2017

17    opinion of the California Court of Appeal:[2]

---

[2] In his traverse, Petitioner conclusorily states that "there are no state findings of fact on the additional factual allegations proffered by Petitioner in respects to issues raised on direct appeal, nor any findings of fact on the issues raised in Petitioner's state habeas petition, therefore, no presumption of correctness is due." Dkt. No. 40 at 6. However, Petitioner did not make any new factual allegations in either his petition or his traverse. The arguments in both his petition and traverse rely on the evidence presented in the state court proceedings. *See generally* Dkt. Nos. 17 and 40. In addition, the state court opinion summarizes the evidence presented at trial, and Petitioner has not disputed that the evidence discussed below was presented at trial. Petitioner incorrectly claims that state court did not make any findings of facts with respect to the issues raised in his direct appeal or in his state court habeas petition. Petitioner presented the same arguments in both his direct appeal and his state court habeas petition, *see* Answer, Exs. 3 and 7, and these arguments were addressed by the state appellate court in a reasoned opinion that made factual findings, *see generally Haqq*, 2017 WL 1210013. The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), unless otherwise indicated in this order.

## I. EVIDENCE AT TRIAL

On September 22, 1998, 15–year-old best friends S. Doe and T. Doe decided to leave their high school and take a bus to a McDonald's in Berkeley for lunch. S. Doe's older sister accompanied them. After eating, the three took the bus back to the AM/PM Market near their school. S. Doe's sister returned to school immediately, but S. Doe and T. Doe decided to go into the store first to buy gum. When the two girls left the store, S. Doe noticed a black van nearby with several people inside and one person outside pumping gas. According to S. Doe, someone inside the van flirted with T. Doe. Thereafter, the van began following the girls as they walked back to school. Suddenly, S. Doe saw someone grab T. Doe from behind and pull her into the van. Quickly thereafter, S. Doe was also grabbed and pulled into the van.

Once the girls were inside, the van began to move and S. Doe heard the men telling T. Doe that they "wanted to have some fun." S. Doe, a virgin at the time, testified that she did not know what they meant. After that was "when it ... started." First, someone named "Twin" instructed S. Doe to take off her shoes and then removed her pants and underwear. [FN 2] Then, he got on top of her and penetrated her vagina with his penis. When Twin was finished, a second man did the same thing. S. Doe could not identify the second man who raped her because she had her eyes "closed through most of it." According to S. Doe, she had never before seen Haqq. She did testify, however, as to how she was feeling at the time, stating that her lower body was in "extreme pain. I couldn't—it was an indescribable feeling. You can't even tell after the first pain was so horrible, you don't even know if the second one was pain. You just can't feel it. You just feel numb after the first one." After the second man raped her, "Twin came back 'cause the other guy was finished already." Twin then raped her a second time, telling her: "'You not going nowhere. We gonna keep you.'"

> FN 2: S. Doe testified that this first man was nicknamed "Twin" and that he and his twin brother lived in her neighborhood.

During the rapes, S. Doe saw T. Doe only periodically, because when T. Doe tried to move closer to her so that the two could be together, the men told T. Doe to move away. Before being raped by Twin for the first time, however, S. Doe did see someone on top of T. Doe. And, after the rapes, S. Doe could see T. Doe looking "[h]urt and lost."

The van eventually stopped and some men got out. S. Doe told one of the men she needed to use the restroom. He told her to "hold it," but when he turned his back she "jumped out and ran and looked for my best friend and didn't know if she got out of the van. I just cut." T. Doe had also run from the van, however, and the two girls soon reunited. When they saw the van following them again, they walked into a store where they observed the van circling. T. Doe went outside and one of the men spotted her. He then began to call S. Doe names. When a neighbor came outside to see if the girls were alright, the van finally drove away. The neighbor contacted S. Doe's mother, who took the girls to Highland Hospital.

At the hospital, both girls underwent an examination by the Sexual Assault Response Team (SART). S. Doe's SART exam revealed that she had sustained "multiple obvious external genitalia injuries that are both gross, meaning you can see them with the naked eye, and see them with the colposcope." During the examination, S. Doe cried, complained of vaginal pain, and reported threats made to her during the attack, including "'[w]e should hit you in the head with a beer bottle,'" and "'[y]ou better be ready tomorrow.'" Hillary Larkin, the Director of the SART team at Highland Hospital (Larkin), testified that one of the seven injuries sustained by S. Doe—a deep laceration—was "pretty impressive ... in terms of a cut or a tear." She further opined with respect to the number of S. Doe's injuries that there was "a much higher number of individual injuries in this patient. I would say statistically, probably, maybe 20 percent of sexual assault victims have this much obvious signings, and this much naked—see with the naked eye injuries, so this is an impressive exam" which revealed "significant injuries." Further, according to Larkin, the sexual assault literature

3

indicates that the more individual injuries a victim sustains, the more likely that the intercourse was nonconsensual. And, indeed, S. Doe's injuries suggested nonconsensual sex to Larkin.

With respect to T. Doe's SART exam, Larkin testified that T. Doe indicated that she had been penetrated by three men. Further, the injuries sustained by T. Doe included a hymeneal tear on her cervix—an injury which, according to Larkin, is consistent with someone who has not previously engaged in sexual intercourse. Moreover, Larkin also testified that the injuries sustained by T. Doe were "[d]efinitely" consistent with nonconsensual intercourse. However, in her opinion, S. Doe's injuries were more significant than T. Doe's.

Shannon Cavness, a criminalist in the Oakland Police Department crime laboratory (Cavness), testified regarding the DNA evidence in the case. According to Cavness, on May 3, 2005, she received a hit matching the DNA from the sperm found in S. Doe's vagina to Haqq. Subsequent testing of a reference sample obtained from Haqq in April 2011 confirmed that Haqq was the sperm donor for the vaginal swab. Indeed, the statistical frequency of the match was approximately one in one quintillion members of the population, a very rare profile. On August 9, 2011, Cavness learned that the DNA from S. Doe's underwear matched Gerald Anthony Demins. At that time, a DNA profile for Gerald Demins' twin brother Jerome Demins was not in the system. Reference samples were subsequently collected and tested for both Gerald and Jerome Demins, leading Cavness to the conclusion that the brothers were identical twins. Since the DNA found in S. Doe's underwear was an exact match to both brothers' DNA, it could not be used to identify which brother was involved in the incident. Finally, a hit also came back with respect to the DNA collected from T. Doe during her SART exam, matching an individual named Jackie Hubbard (Hubbard).

Joseph Billingsley, an employee of Civicorps School (Billingsley), testified at trial regarding a possible connection between Haqq, Hubbard, and Jerome Demins. Civicorps is a nonprofit organization, formerly known as the East Bay Conservation Corps, which provides employment and training for 18 to 21 year olds. According to Billingsley, company records indicate that Haqq, Hubbard, and Jerome Demins all worked at the East Bay Conservation Corps in 1998 and/or 1999, when they were all approximately 18 years old. The records were insufficient, however, to determine whether the three men ever worked together during a timeframe prior to the September 1998 incident.

*Haqq*, 2017 WL 1210013, at *1–*3.

### III. DISCUSSION

**A.      Standard of Review**

A petition for a writ of habeas corpus is governed by the AEDPA. This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). Petitioner first raised the claims presented in the instant federal habeas petition in his direct appeal, and the California Court of Appeal denied them in a reasoned opinion. *Haqq*, 2017 WL 1210013. He again raised these claims in his petition for

5

review, which was summarily denied by the California Supreme Court. Answer, Ex. 7. Accordingly, in addressing the instant federal habeas petition, the Court reviews the California Court of Appeal's opinion.

**B.      Petitioner's Claims**

**1.      Preindictment Delay**

Petitioner argues that his federal due process rights were violated by the approximately six year delay between the May 2005 cold hit which identified him as a possible suspect in this case and the July 2011 filing of the complaint because the delay prejudiced his ability to defend himself. The delay deprived him of exonerating testimony from Hubbard and compromised his ability to defend himself because his memory regarding his activity on September 22, 1988 had faded. Dkt. No. 17-2 at 7, 10-40. Petitioner argues that the delay was unjustified because the only evidence needed to prosecute was the cooperation of S. Doe and T. Doe; because the police officer violated Oakland Police Department ("OPD") policy in classifying S. Doe as uncooperative without speaking with her; because OPD delayed three years before interviewing S. Doe; because OPD improperly allocated funds to compensate litigants pursuant to a civil settlement; and because the loss of T. Doe as a witness prevented Petitioner from preparing a defense. Dkt. No. 40 at 7-12.

Respondent argues that the preindictment delay was not sufficiently prejudicial and unjustified so as to violate due process because (1) this Court must presume that the state court's factual finding that no prejudice resulted from the delay was correct (and the finding is supported by the record in any event); and (2) the state court's conclusion that the preindictment delay was investigative and thus justified was objectively reasonable. Dkt. No. 26-1 at 11-26.

The California Court of Appeal denied the claim as follows:

***A. Pre–Indictment Delay***
1. *Background Information*
As mentioned above, on April 11, 2013, Haqq filed a motion to dismiss, arguing that the lengthy precharging delay in this case resulted in a denial of his federal and state constitutional rights to due process. Specifically, Haqq claimed that the approximately six years between the May 2005 cold hit which identified him as a possible suspect in this matter and the July 2011 filing of the complaint prejudiced his ability to defend himself. In particular, Haqq asserted that he was prejudiced by the delay because his memory of the events of September 1998 had faded; the whereabouts of Hubbard, a potential defense

witness, were unknown; and he was unable to take advantage of possible concurrent sentencing during the period of the delay. [FN 3]

> FN 3: During this timeframe, Haqq was serving an aggregate term of 18 years after convictions in 2010 for two unrelated matters.

At the hearing on Haqq's motion to dismiss on April 18, 2013, Oakland Police Department Lieutenant Kevin Wiley (Wiley) testified that in 2005 and 2006 the Special Victims Unit had a backlog of about 2000 open and active cases, with only six to eight investigating officers to handle them. Moreover, only two officers handled cold hit sexual assault cases. At that time, there was a backlog of about 150 such cases. And, the two investigators who handled the cold hit DNA cases also had other duties. This lack of resources continued through 2011.

In May 2005, the department was notified of a possible DNA hit matching Haqq to the instant case. At that time, there was no tracking system in place for these notifications. In 2006/2007, however, a new protocol was adopted to ensure that any match would result in an investigator being assigned to the case. That investigator would then conduct further investigation, including contacting the victim. As a consequence, Officer Herb Webber was assigned to investigate the Haqq DNA match in November 2007. However, by April 2008, after making attempts to contact S. Doe, he determined that she did not wish to pursue the matter. He also spoke with T. Doe in this timeframe, who stated that she wanted to "think about it," but never contacted him.

Wiley testified that—due to the volume of cases the department was handling at that time—if a victim was uncooperative when contacted, the department was "forced to triage cases." Thus, if a victim was not willing to prosecute, the case would be set aside so that the investigators could focus their resources on cases with cooperative victims. This might change if other evidence or witnesses were available to assist in a prosecution. Additionally, the department had a general policy not to collect a reference sample from a suspect until a victim indicated she would cooperate with a prosecution. According to Wiley, this policy was in place because there were cases in which a DNA hit "led the victim to change their story from it being a violent act to it being consensual, and it would make no difference to get the reference sample."

The papers filed by the District Attorney in opposition to Haqq's motion to dismiss supplied additional details regarding the investigation, gleaned from the testimony given before the grand jury. [FN 4]  As discussed above, in October 2007, the department received another cold hit indicating that DNA taken from T. Doe matched Hubbard. In December 2010, a third cold hit was obtained, matching DNA from S. Doe's underwear to Gerald Demins. Upon learning that Gerald Demins had a twin brother, reference samples were taken from both twins and found to be identical. Thus, neither twin could be implicated in the incident based on their DNA profiles.

> FN 4: In addition, according to the record, the trial court read the entire grand jury transcript prior to ruling on the motion to dismiss.

Oakland Police Sergeant Ross Tisdell (Tisdell) was assigned to the case in February 2011. Tisdell, who also testified at the hearing, indicated that he began his investigation by attempting to find T. Doe. Then, on March 15, 2011, Tisdell interviewed S. Doe, who was now agreeing to cooperate. That same day, Tisdell created photo six packs of the three possible suspects and showed them to S. Doe. The first photo array six pack included Gerald Demins, who S. Doe positively identified as one of her assailants. The second photo array included Haqq, and the third photo array included Hubbard. S. Doe was unable to identify either Haqq or Hubbard. On April 21, 2011, Tisdell obtained a DNA reference sample from Haqq. As stated above, analysis of this sample in June 2011 indicated a match

to the DNA profile from S. Doe's vaginal swab. A felony complaint was then filed on July 15, 2011, and on November 3, 2011, the grand jury indicted Haqq on the instant charges. Tisdell testified that, thereafter, in the summer of 2012, he located Hubbard in custody and attempted to speak to him regarding this case. Hubbard, however, asked for an attorney and refused to discuss the matter.

Haqq's attorney conceded that he was making no argument that charging in this case was delayed in order to put Haqq at a tactical disadvantage. Rather, he argued that the Oakland Police Department's inability to handle the investigation in a timely manner due to staffing shortages was negligent and amounted to "administrative malfeasance" which violated Haqq's due process rights. He additionally asserted that Haqq was prejudiced by the delay as described above.

The trial court disagreed and denied Haqq's motion. With respect to prejudice, the court rejected the argument that the loss of Hubbard's testimony was prejudicial, stating that it was unlikely that Hubbard would be willing to provide a statement in the matter given that he was "in jeopardy of being charged as an aider and abettor to all of these charges." Indeed, the trial court stated that it could "almost find beyond a reasonable doubt that [Hubbard] would not testify as to the events involved in this case." The court also rejected the notion that Haqq was prejudiced by losing the opportunity for concurrent sentencing based on the existence of section 669: "In other words, if [Haqq] is convicted of this offense, then it's incumbent upon me under that section to determine whether his present existing sentence for which he has not, as I understand it, he has not completed his term, shall be concurrent or consecutive. ... [¶] ... It's something that I'm required to do in case [Haqq] is convicted. So he's not losing any chances at all."

The trial court did acknowledge that fading memories could be a problem, but also queried: "[I]s there any more faded memory that accrues after 2005 than the faded memory that would already have accrued between 1998 and 2005?" In addition, the court emphasized that the memory issue cut both ways, noting that S. Doe had recently been unable to pick Haqq out of the photo array, a circumstance which benefitted him. Moreover, the court reasoned that, unless Haqq could discredit the DNA evidence, the only question at trial would be consent. With respect to that issue, the court opined: "[I]t's a little bit hard for me to accept that, you know, if this did happen under the circumstances that we know that it did happen, that the victim would have forgotten whether she consented or not. And certainly she has recently testified before the grand jury that she did not." Indeed, as to faded memories in general, the court found any prejudice "very speculative," stating "you have to take into consideration, well, is this an event that would be likely to be forgotten by anybody? And certainly a question of having sex with two girls in a van with a number of other individuals engaging in the same activity, whether consensual or non-consensual, is not something that would be forgotten."

In the end, the only possible prejudice that the court could identify was the loss of potentially exculpatory testimony from T. Doe: "[T]o be fair, there is [T. Doe], who I suppose might have been located had the case been brought more timely and she might be able to offer some evidence as to whether—on the issue of consent. And certainly there are indications that she does not want to prosecute from which you could infer that, well, that might be one of the reasons. Of course, there's a whole panoply of other reasons. So admittedly, evidently she was available within this time period between 2005 and 2011. So to that extent, I think there's some prejudice."

On the issue of justification for the delay, the trial court pointed out that "the mere fact that the evidence comes back in 2005, as [Wiley] testified, doesn't mean that before they take some action against [Haqq], such as arrest in order to get a DNA swab, that you [don't have] to find out whether you got a prosecutable case, which means speaking to the victims all over again and so on." Further, the trial court specifically credited Wiley's

testimony regarding the department's investigative practices, stating: "I think what most impressed me ... is that there is a reason for a delay until there is an interview with the particular complaining witness because complaining witnesses also often when informed that there is DNA evidence change their stories as to whether or not it was violent, as to it being consensual. So the police cannot be faulted for wanting to interview the witness before arresting or otherwise getting samples from the defendant." Concluding that this investigative justification outweighed any possible loss of T. Doe's testimony, the trial court denied the motion to dismiss.

2. *Analytical Framework and Analysis*

On appeal, Haqq renews his claim that the precharging delay of approximately six years in this case violated his federal and state constitutional rights to due process. A precharging delay does not implicate speedy trial rights. However, Haqq is correct in asserting that such a delay may violate due process if it is "unjustified and prejudicial." (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson* ); see also *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 505.) Specifically, "'[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' [Citation.] Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.'" (*Nelson, supra*, 43 Cal.4th at p. 1250.)

A defendant seeking to dismiss a case on grounds of precharging delay must demonstrate prejudice arising from that delay. (*Nelson, supra*, 43 Cal.4th at p. 1250.) Such prejudice is not presumed, but must be affirmatively demonstrated. (*People v. Martinez* (2000) 22 Cal.4th 750, 767.) "'The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.'" (*Nelson, supra*, 43 Cal.4th at p. 1250.) If a defendant fails to show prejudice, however, the court need not inquire into the justification for the delay as, under such circumstances, there is nothing to "'weigh.'" (*Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1541.)

State and federal constitutional standards regarding what justifies delay in this context differ. (*Nelson, supra*, 43 Cal.4th at p. 1251.) In *Nelson*, our Supreme Court indicated that the exact standard under the federal Constitution is "not entirely settled" but appears to require "'a showing that the delay was undertaken to gain a tactical advantage over the defendant.'" (*Ibid.* ) However, since "the law under the California Constitution is at least as favorable for [the] defendant in this regard as the law under the United States Constitution," the *Nelson* Court chose to analyze the issue under California law. (*Ibid.* ) We will do the same here.

"[U]nder California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Nelson, supra*, 43 Cal.4th at p. 1255.) Thus, "whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.* at p. 1256.)

Moreover, when analyzing a claim of precharging delay, we note that "[t]he due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Rather, the task of the reviewing court is to determine whether [such] delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency. Prosecutors are under no duty to file charges

as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." (*People v. Dunn–Gonzalez* (1996) 47 Cal.App.4th 899, 914.) In addition, as the *Nelson* court opined: "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. ... 'Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay ....' [Citation.] It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson*, *supra*, 43 Cal.4th at pp. 1256–1257.)

We review a trial court's ruling on a motion to dismiss based on prejudicial precharging delay for abuse of discretion, deferring to any underlying factual findings supported by substantial evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 431.) Thus, for instance, whether a defendant met the initial burden of showing prejudice is a factual question for the trial court. (*People v. Hill* (1984) 37 Cal.3d 491, 499.) Further, whether the precharging delay was unreasonable is also a question of fact. (*People v. Miranda* (2009) 174 Cal.App.4th 1313, 1330.)

In the present case, the trial court concluded that the only possible prejudice from the precharging delay was the loss of T. Doe as a potentially exculpatory witness on the issue of consent. On appeal, Haqq argues that the prejudice arising from the delay was more extensive than that recognized by the trial court, again asserting that he was prejudiced by his fading memory, inability to locate Hubbard, and loss of the opportunity for concurrent sentencing. We agree with the District Attorney, however, that the trial court's prejudice finding in this case was amply supported by the record.

Preliminarily, we note that loss of possible concurrent sentencing is not a factor to be considered as part of a trial court's initial prejudice analysis. Rather, our high court has held "that a defendant claiming a speedy trial violation under the California Constitution must show that the delay has impaired the ability to defend against the charged crime because, for instance, a witness has become unavailable, evidence has disappeared, or the memory of a potential witness has faded. If the defense makes that initial showing, the trial court may then ... consider the defendant's loss of an opportunity to serve a concurrent sentence in weighing all of the prejudice to the defendant against the prosecution's justification for the delay." (*People v. Lowe* (2007) 40 Cal.4th 937, 946, fn. omitted.) Further, in the present case, since Haqq's existing 18–year sentence resulted from two convictions in 2010, we agree with the trial court that section 669—which requires a trial court to consider whether any subsequent sentence should run concurrently or consecutively—minimized the potential for any prejudice in this case based on sentencing. At most, Haqq lost the possibility of serving a small percentage of his total sentence concurrently. Moreover, that possibility was a slight one, given that his three convictions involved separate acts of violence which occurred at different times and in different places. (See Cal. Rules of Court, rule 4.425(a) [listing criteria affecting concurrent vs. consecutive sentencing].) And, indeed, when the trial court imposed sentence in this case in June 2013, it determined that these subsequent three counts should run consecutively to Haqq's existing sentence.

As for Haqq's other two asserted grounds for prejudice—fading memory and the loss of Hubbard as a potential defense witness—substantial evidence supports the trial court's conclusion that neither of these two factors was likely to cause any appreciable prejudice to Haqq. (See *Serna v. Superior Court* (1985) 40 Cal.3d 239, 250 [conclusory statements asserting faded memory of the events in question insufficient to support a finding of prejudice]; *Blake v. Superior Court* (1980) 108 Cal.App.3d 244, 250–251 [vague offer of proof that various potential alibi witnesses were unavailable insufficient to demonstrate cognizable prejudice].) With respect to Hubbard, in particular, we agree with the trial court

that he would be extremely unlikely to provide a statement in the case. Indeed, he refused to speak to Tisdell in 2012. And, even if he did agree to testify, at most, he could only potentially offer the obviously self-serving statement that any sex during the September 1998 incident was consensual.

Moreover, although we accept, as supported by substantial evidence, the trial court's reasoning that Haqq might possibly have been prejudiced by the unavailability of T. Doe, we agree with the District Attorney that, on this record, any such potential for prejudice was slight. According to T. Doe's SART exam, conducted almost immediately after the incident, T. Doe reported being raped by three men and her injuries were consistent with nonconsensual sex. Given these circumstances, the more likely conclusion by far is that T. Doe's testimony, if obtained, would have undermined any defense claim of consent.

With respect to justification for the delay, Haqq argues at length on appeal that the Oakland Police Department was "so decimated by budget and staffing cuts" that the precharging delay in this case must be "recognized as a product of negligence" which violated his due process rights. However, we again find ample support in the record for the trial court's contrary conclusion—that the delay was an "investigative delay, nothing else." (See *Nelson*, *supra*, 43 Cal.4th at p. 1256.) The May 2005 cold hit matching Haqq to DNA found in S. Doe was simply an investigative lead. A reference sample was needed from Haqq to confirm the match. However, as of March 2008, the department was unable to obtain S. Doe's cooperation in any prosecution with respect to the events of September 1998. Given this circumstance as well as the admittedly significant understaffing of the Oakland Special Victims Unit, it was entirely reasonable to triage cases by prioritizing those with a cooperating witness. (*Id.* at pp. 1256–1257 ["[i]t is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner"].) This was especially true given Wiley's testimony that it was Department policy not to obtain a reference sample from a potential defendant without a cooperating witness as a DNA hit at times "led the victim to change their story from it being a violent act to it being consensual, and it would make no difference to get the reference sample." Once additional cold hits were received and S. Doe agreed to cooperate, the matter proceeded apace. We thus decline Haqq's invitation to distinguish *Nelson* and attribute the delay to a " 'broken' " police department. Rather, under the circumstances, we see no need to second-guess "how the state allocates its resources or how law enforcement agencies could have investigated" this matter. (See *Nelson*, *supra*, 43 Cal.4th at pp. 1256–1257.)

In sum, the trial court here was required to weigh the slight and highly speculative prejudice identified by Haqq (the unavailability of T. Doe and the potential loss of some concurrent sentencing) against the prosecution's strong justification for the delay. Unremarkably, it concluded that the justification for the delay outweighed any potential prejudice. We see no error, and certainly no abuse of discretion.

*Haqq*, 2017 WL 1210013, at *4–*7.

### a. Legal Standard

The Due Process Clauses of the Fifth and Fourteenth Amendments protect criminal

defendants from the prejudicial effects of unjustified preindictment delay. *See United States v.*

*Lovasco*, 431 U.S. 783, 789-92 (1977); *United States v. Marion*, 404 U.S. 307, 324-25 (1971).

The role of the Due Process Clauses, however, is limited to protecting against "oppressive delay."

*Lovasco*, 431 U.S. at 789. A due process claim of oppressive delay requires "proof of actual

prejudice" to the defense. *Id.* But while proof of prejudice is a necessary element of a due process claim, proof of prejudice is not sufficient to prevail on a due process claim. The due process inquiry must consider the reasons for the delay. *Id.* at 790. The Ninth Circuit has articulated this standard as a two-prong test requiring (1) a showing of actual, non-speculative prejudice from the delay; and (2) a showing that "the delay, when balanced against the prosecution's reasons for it, offends those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *United States v. Sherlock*, 962 F.2d 1349, 1353-54 (9th Cir. 1989) (citing *Lovasco*, 431 U.S. at 789).

Proof of prejudice is a "heavy burden that is rarely met," and it must be definite and not speculative. *United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007) (internal quotations omitted). "Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice." *United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995). Moreover, a specific claim of lost testimony or lost witnesses will not satisfy the "actual prejudice" prong if the indictment is brought within the statute of limitations, or if the defendant fails to make a specific showing as to what a lost witness would have said. *Corona-Verbera*, 509 F.3d at 1113 (finding actual prejudice not established where indictment delayed five years). Where actual prejudice is not established, the reasons for the delay need not be considered. *See United States v. Bracy*, 67 F.3d 1421, 1427 (9th Cir. 1995). If a petitioner can demonstrate actual prejudice, then the court must weigh the prejudice against the length of the delay and the reason for it. *Id.* A petitioner must also show that, even if there were prejudice, the length of the delay balanced against the reasons for it "offends those fundamental conceptions of justice which lie at the base of our civil and political institutions." *United States v. Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005) (internal quotation marks and citations omitted).

### c. **Analysis**

Having carefully reviewed the record, the Court concludes that the state court's rejection of this claim was neither an unreasonable application of, or contrary to, Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner argues that he was prejudiced by not having T. Doe as a witness, arguing that T. Doe's testimony would have supported an argument that the sex was consensual, and that T. Doe's testimony would have further undermined S. Doe's credibility which was already suspect because of the inconsistencies in her testimony. Dkt. No. 40 at 11-12.

The state court reasonably concluded that, based on the record, it was far more likely that T. Doe's testimony, if obtained, would not have undermined S. Doe's credibility and would have instead undermined any defense claim of consent. The record indicates that immediately after the incident, T. Doe reported being raped by three men and had injuries consistent with nonconsensual sex. Moreover, even if S. Doe's testimony was inconsistent in some areas, S. Doe's testimony was consistent as to the key issue – her lack of consent to the sexual assault – and this testimony was supported by the evidence presented at trial, including the SART exam and related testimony. RT 291, 293-300, 564-77, 606. Petitioner's claim that T. Doe would have testified that S. Doe consented to the encounter is entirely speculative. Nowhere in the record does T. Doe state that S. Doe consented to the sexual encounter. Petitioner argues that the following statements by S. Doe in the police report indicate that T. Doe consented: T. Doe giggled with the boys beforehand, and T. Doe told S. Doe not to resist the boys' sexual advances. Neither of these statements clearly indicates consent. And as the state court noted, these statements, in the context of the entire record, could also reasonably support S. Doe's testimony that the sex was nonconsensual.

Petitioner incorporates by reference his arguments that the preindictment delay deprived him of exonerating testimony from Hubbard and compromised his ability to defend himself because his memory regarding his activity on September 22, 1988 had faded. The claim that Hubbard would have provided exonerating testimony is speculative. Given that Hubbard had already refused to speak to investigators regarding the case, the trial court reasonably concluded that Hubbard was unlikely to testify on Petitioner's behalf, especially because it might expose him to criminal liability, and reasonably concluded that any exonerating statement would be of marginal value to Petitioner because it would be "obviously self-serving." *Haqq*, 2017 WL 1210013, at *7. Petitioner's claim that his faded memory prejudiced him is conclusory. He does not specify what he might have remembered that might have exonerated him. The DNA evidence

established that he engaged in sexual activity with S. Doe on that day. The only remaining issue was whether S. Doe consented to the sexual activity, which presumably was not a detail he would forget over time.

Finally, Petitioner also incorporates by reference his argument that the preindictment delay was not justified because the Oakland Police Department ("OPD") ignored Dr. Donovan's request that the case be categorized a priority; because Webber incorrectly categorized S. Doe as uncooperative in 2008 when he had not spoken to her in person as required by OPD policy; because the OPD waited another three years (until 2011) to contact S. Doe again; and because the OPD's Special Victims Unit was underfunded due to administrative malfeasance. The key inquiry in assessing whether preindictment delay has violated a petitioner's due process rights is whether the delay caused the petitioner actual prejudice.

Here, Petitioner has failed to establish any actual prejudice. In addition, there is ample evidence in the record supporting the trial court's determination that the preindicment delay was investigative. The Supreme Court has described investigative delay as a prosecutor declining to seek an indictment until she "is completely satisfied that [s]he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Lovasco*, 431 U.S. at 795. Investigative delay, generally speaking, does not violate the Due Process Clause, while delay undertaken by the government solely to gain a tactical advantage does. *Id.* The evidence presented in the state court proceeding, including that S. Doe repeatedly expressed ambivalence in her trial testimony about pursuing the case, supports the state court's finding that Officer Webber reasonably concluded that in 2008, S. Doe was unwilling to pursue the matter, and its finding that the prosecution decided not to pursue the case pursuant to OPD policy which prioritized cases with cooperating witnesses. Nothing in the record indicates that the delay was to gain a tactical advantage. And as discussed above, the prosecution did not gain a tactical advantage by the preindictment delay, and Petitioner did not suffer actual prejudice from the preindictment delay.

Petitioner has not rebutted the presumption of correctness attached to the California Court of Appeal's factual findings that any potential for prejudice was slight and was outweighed by the prosecution's strong justification for the delay. The state court's rejection of this claim was based

14

on a reasonable determination of the facts in light of the evidence presented in the state court proceeding, and was not an unreasonable application of, or contrary to, Supreme Court precedent. *Lovasco*, 431 U.S. at 796 ("to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."). Habeas relief is denied on this claim.

## 2. Victim's Emotional Testimony

Petitioner argues that he was deprived of due process when the trial court failed to address or limit S. Doe's repeated emotional outbursts while testifying and her repeated departures from the witness stand; when trial counsel failed to object to S. Doe's behavior and the trial court's approach; and when the prosecutor committed misconduct by repeatedly questioning S. Doe about the emotional and psychological pain and suffering caused by the assault. Dkt. No. 17-2 at 8, 37-58.

The California Court of Appeal denies this claim as follows:

### B. Testimony of S. Doe
During S. Doe's testimony recounting her September 1998 kidnapping and multiple rape, S. Doe stated repeatedly that she did not want to testify, that she blamed herself for the attack since it had been her idea to get gum before returning to school, and that recalling the incident was extremely painful for her. Apparently, S. Doe also impulsively left the stand on several occasions when she became emotionally overwhelmed. Haqq now contends on appeal that his federal and state constitutional rights to a fair trial were violated in connection with S. Doe's trial testimony because: (1) the prosecution's repeated questioning of S. Doe regarding the psychological pain caused by the attack amounted to prosecutorial misconduct, calculated to inflame the passions of the jury; (2) the trial court failed to curtail S. Doe's many emotional reactions or otherwise mitigate their prejudicial impact on the jury; and (3) his trial attorney's failure to object and/or request appropriate admonitions with respect to S. Doe's conduct and the prosecutor's questioning constituted ineffective assistance of counsel. We address each contention in turn.

With respect to the prosecutor's questioning of S. Doe, "[a] prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales* ).) Thus, a prosecutor may not make comments which are calculated to arouse a jury's passions or prejudices. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1379; *People v. Mayfield* (1997) 14 Cal.4th 668, 803, overruled on other grounds as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390 & fn. 2.) However, a prosecutor may question a witness as to any relevant matters (*People v. Hajek and Vo* (2014) 58 Cal.4th

1144, 1210, overruled on other grounds as stated in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216) and may ask leading questions "when they are designed to lead the witness more quickly to matters which are material to the issues." (*People v. Orona* (1947) 79 Cal.App.2d 820, 827; see also *People v. Jackson* (1954) 124 Cal.App.2d 787, 789.)

Our review of the record in this case makes evident that S. Doe was clearly a reluctant and highly emotional witness. As S. Doe recounted the events of September 22, 1998, she repeatedly indicated that she did not want to testify. A typical example of the interplay between S. Doe and the prosecutor is set forth below:

"Q. [Did] [y]ou notice a van when you got out of A.M.–P.M.?

"A. I don't want to go back to that place.

"Q. Now you just said that you don't want to go back to that place.

"A. I don't want to go.

"Q. Does it hurt when you try to think about going back to that place?

"A. It always hurts.

"Q. It always hurts. And you've had people making you go back to that place?

"A. Several times, over and over again. I don't want to go back to that place. I don't want to go back. I just—I just want to be home and I don't want to do this.

"Q. I know it's hard and it's hard for me to ask you to go back to that place one last time, but I've got to ask you to now. I just need you to tell the truth and it will go by quickly, okay? [¶] Do you need some water?

"A. (Shakes head negatively.) I don't want to be here it's not a good place. [ ]

"Q. It's one last time. I'm just asking you to share your story with the jury. Okay.

"A. I don't want to share my story. I'm tired of sharing my story. It's not a good story. It never was a good story.

"Q. It was not a good story? I know this is hard, but I'm going to ask you when you got out of that A.M.–P.M., did you notice a van?

"A. Yes."

What this questioning shows—especially when viewed in the context of S. Doe's testimony as a whole—is that the prosecutor was acknowledging S. Doe's feelings about the case, not to enflame the jury, but to help S. Doe overcome those feelings one last time so that she could bring herself to testify. And, in fact, the prosecutor's approach was successful, as S. Doe was ultimately able to testify at length regarding the September 1998 incident. Under these circumstances, it is not reasonably likely that the jury construed the prosecutor's questions as anything other than a necessary tactic designed to elicit crucial testimony from an extremely reluctant witness. (See *Morales*, *supra*, 25 Cal.4th at p. 44.)

Additionally, as the District Attorney points out, the issues explored by the prosecutor's questioning—to the extent they revealed the significant emotional impact of the attack on both S. Doe and her family—were relevant to S. Doe's credibility as a witness. The prosecutor was obviously aware that S. Doe had previously made a number of inconsistent

statements, in particular those in an affidavit that she executed in October 2012 indicating that the whole incident had never happened and that she and T. Doe were not raped. At trial, S. Doe testified that she signed the affidavit because she did not want to fight any more and wanted to protect her family. Her testimony describing how she and her family were negatively impacted by the rape bolstered her credibility with respect to this explanation and thus was highly relevant to a fundamental issue in the case—whether she was, in fact, raped. (See *People v. Whalen* (2013) 56 Cal.4th 1, 62 [direct examination proper where relevant to the credibility of the witness].) In sum, since the prosecutor's examination was necessary to elicit testimony regarding the incident in question and also touched on matters relevant to S. Doe's credibility, we see no prosecutorial misconduct in this case. [FN 5]

> FN 5: We acknowledge that Haqq failed to object at trial to the prosecutor's examination of S. Doe or request a curative admonition. As a general matter, "[t]o be cognizable on appeal, a defendant '"must make a timely objection at trial and request an admonition; otherwise, the [claim of prosecutorial misconduct] is reviewable only if an admonition would not have cured the harm caused by the misconduct."'" (*People v. Valdez* (2004) 32 Cal.4th 73, 122.) We reach the merits of the claim in this case, however, due to Haqq's related assertion—discussed further below—that his counsel was ineffective for failing to object.

As for Haqq's argument that the trial court had a duty to curb the prosecutor's questioning of S. Doe, we again find no error. (See *Cooper v. Superior Court* (1961) 55 Cal.2d 291, 301 [court has inherent power to exercise reasonable control over all proceedings in order to insure the orderly administration of justice]; see also Code Civ. Proc., § 128.) Whether and how leading questions are used on direct examination is committed to the sound discretion of the trial court. (See Evid. Code, § 767; *People v. Spain* (1984) 154 Cal.App.3d 845, 853; *People v. Wilson* (1941) 46 Cal.App.2d 218, 224 [leading questions may be asked on direct examination "when it appears that the interests of justice so require"].) And, as discussed above, we do not view the prosecutor's questioning of S. Doe as improper under the circumstances.

With respect to Haqq's claim that the court should have better controlled S. Doe's "unauthorized flights from the witness stand" and other inappropriate behaviors, we likewise see no indication that the trial court handled the issue improperly. Haqq suggests that the court should have spoken to S. Doe out of the presence of the jury about her conduct, periodically taken brief recesses to help her, and admonished the jury not to be swayed by the emotions generated by S. Doe's behaviors. However, confronting the fragile witness regarding her conduct might well have led to the complete loss of her testimony. And admonishing the jury could actually have had the reverse effect, highlighting the behaviors Haqq wanted the jury to disregard. Instead, when S. Doe needed a break, the trial court variously called recesses, allowed a witness to be called out of order, or ended testimony for the day, thereby minimizing any disruption without unduly emphasizing S. Doe's conduct. We see nothing improper in the trial court's actions, and certainly nothing that rendered Haqq's trial fundamentally unfair.

Finally, Haqq contends that his trial attorney's failure to object and/or request appropriate admonitions with respect to S. Doe's conduct and the prosecutor's questioning constituted ineffective assistance of counsel. In order to prevail on such a claim, Haqq must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. (*People v. Orloff* (2016) 2 Cal.App.5th 947, 955.) Further, on direct appeal—where counsel's strategic reasons for the challenged decision do not appear on the record—we will not find ineffective assistance of counsel unless "'there could be no conceivable reason for counsel's acts or omissions.'" (*Ibid.*; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) Here, we have found no error in the conduct of either the prosecutor or the court in the questioning of S. Doe. Thus, defense counsel's

failure to object and/or seek appropriate admonitions was hardly unreasonable. Moreover, we can conceive of any number of tactical reasons why counsel chose not to object— including not wanting to call further attention to the underlying reasons for S. Doe's behaviors and the hope that, if the questioning continued, at some point S. Doe might simply be unable to continue. In addition, it is difficult to identify any possible prejudice to Haqq, since the DNA evidence in this case showed that he and S. Doe engaged in sexual intercourse and the testimony of both S. Doe and Larkin overwhelmingly supported the conclusion that the intercourse was nonconsensual. Under these circumstances, Haqq's claim of ineffective assistance is meritless.

*Haqq*, 2017 WL 1210013, at *8–*10.

### a.   Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct when he repeatedly asked S.

Doe "about the emotional and psychological pain and suffering caused by the assault," and when

the prosecutor repeatedly asked about, or discussed, S. Doe's reluctance to testify and feelings of

personal culpability.  Dkt. No. 17-2 at 8.  Presumably, Petitioner is arguing that repeatedly

pursuing this line of questioning improperly inflamed the jury.

A defendant's due process rights are violated when a prosecutor's misconduct renders a

trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Smith v. Phillips*,

455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under

*Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question

is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112

(9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that, for

AEDPA review purposes, *Darden* is the clearly established federal law regarding a prosecutor's

improper comments).  Improper questioning of a witness by the prosecutor is not alone sufficient

to warrant reversal.  Rather, the relevant inquiry on habeas is that dictated by *Darden*, 477 U.S. at

181, i.e., whether the prosecutor's behavior so infected the trial with unfairness as to make the

resulting conviction a denial of due process.  *See Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir.

1998).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire

proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as

to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929

(9th Cir. 1995).  In considering whether the questioning deprived the defendant of a fair trial, the

witness' testimony should be viewed as a whole to determine the impact of the improper questioning. *See id*. at 934-35 (prosecutor's questioning witness as to whether she was afraid of defendant did not render proceedings fundamentally unfair in light of witness' other testimony that defendant murdered her mother, stabbed her sister, stabbed her, and then tried to burn down their house while victims were still inside).

The Court has examined the record and finds that the state court reasonably concluded that the prosecutor's repeated questioning was not intended to inflame the jury, but rather to help S. Doe overcome her feelings about the case so that she could testify clearly about the relevant events. The record clearly shows that S. Doe was reluctant to testify; that S. Doe had conflicting feelings about both the sexual assault and the case against Petitioner; and that the repeated questioning was intended to, and necessary to, elicit testimony regarding whether S. Doe consented to the sexual activity and to address the credibility issues posed both by the affidavit signed by S. Doe and by S. Doe testifying that she was reluctant to discuss the incident.

And even assuming arguendo that the prosecutor's repeated questioning was improper, this questioning did not render the trial fundamentally unfair because there was significant evidence of Petitioner's guilt. Petitioner's DNA established that he had engaged in sexual activity with S. Doe. S. Doe's SART exam, the police interview with S. Doe, and S. Doe's testimony supported a finding that the sexual activity was nonconsensual.

Having carefully reviewed the record, the Court concludes that the state court's rejection of this claim was neither an unreasonable application of, or contrary to, Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Habeas relief is denied on this claim.

### b.    Ineffective Assistance of Counsel

Petitioner argues that trial counsel was ineffective, in violation of the Sixth Amendment, when he failed to object to the prosecution's repeated questioning of S. Doe regarding her feelings regarding the assault, her reluctance to testify, and her feelings of personal culpability. He argues that allowing S. Doe to make emotional outbursts and walk off the stand deprived him of a fair trial, and alleges that the trial court denied his request for a mistrial due to the trial counsel's

19

failure to object. Dkt. No. 17-2 at 8.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance of counsel, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things.

First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687–88. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the *Strickland* test "if the petitioner cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the

United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See id.* at 190; *Harrington v. Richter*, 562 U.S. 86, 88-89 (2011) (same); *Premo v. Moore*, 562 U.S. 115, 122 (2011) (same). The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

As discussed *supra*, the prosecutor did not engage in misconduct. Because the line of questioning did not constitute misconduct, trial counsel reasonably chose not to object. *Cf. id.* *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009) (abandoning a defense that has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving the defense). The United States Supreme Court has never required defense counsel to pursue every nonfrivolous claim or defense, regardless of its merit, viability, or realistic chance of success. *Knowles*, 556 U.S. at 125, 127; *see, e.g., Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (finding counsel's failure to object to admission of defendant's prior sexual misconduct as propensity evidence not ineffective where evidence would have been admitted in any event to show common plan or intent). In addition, nothing in the record indicates that the trial court would have sustained an objection to the prosecutor's questioning or issued an admonition. The trial court accommodated the prosecution's efforts to make S. Doe comfortable on the stand by allowing for witnesses to be called out of order and calling recesses when S. Doe seemed particularly upset. RT 220-21, 256, 276. Moreover, the record indicates that trial counsel challenged S. Doe's recollection of the relevant events and her overall credibility by extensively cross-examining her. RT 314-390. Given S. Doe's emotional testimony and fragile state, trial counsel could have reasonably decided that objecting during direct testimony would only make the jury more sympathetic to S. Doe, and that it would be more effective to challenge S. Doe during cross-

21

examination.

Petitioner argues that trial counsel's performance was deficient in that the trial court relied on trial counsel's omissions in denying the motion for a mistrial. Petitioner is incorrect. Trial counsel raised two grounds for mistrial: that a juror used the term rapist and that jurors were emotionally affected by seeing S. Doe get up and leave the courtroom. Although the trial court noted that trial counsel had not objected to either issue at the time they occurred, the trial court did so merely for the purpose of making a complete record. The trial court then proceeded to deny the mistrial motion on the merits, and not on the basis that counsel had failed to object. RT 618-19.

Finally, where the defendant is challenging his conviction, as is the case here, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 694). As discussed *supra*, there was significant evidence of Petitioner's guilt: DNA results established that he had engaged in sexual activity with S. Doe; S. Doe's SART exam and police interview with S. Doe supported a finding that the sexual activity was nonconsensual; and S. Doe's testimony was consistent as to the sexual activity being nonconsensual.

The state court's rejection of this ineffective assistance of counsel claim was neither an unreasonable application of, or contrary to, Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Plascencia v. Alameda*, 467 F.3d 1190, 1201 (9th Cir. 2006) (IAC claim not established because "any prejudicial effect was at best minute" from counsel's failure to object to evidence about existence of a drug in murder defendant's system where only killer's identity was in dispute). Habeas relief is denied on this claim.

**c.      Trial Court Failure to Address S. Doe's Testimony or Behavior**

Petitioner argues that his due process rights were violated when the trial court failed to address or curb S. Doe's repeated emotional outbursts while testifying or her repeated departures from the witness stand. Dkt. No. 17-2 at 8. In support of this argument, Petitioner cites to *Strickland v. Washington*, 466 U.S. 688, 684-85 (1984); Schwarzer, *Dealing with Incompetent*

*Counsel – The Trial Judge's Role*, 93 Harv. L. Rev. 633, 639 n.27, 649 (1980); and Cal. Code Civ. Proc. § 128.  The Schwarzer article argues that the trial court has a responsibility to ensure a fair trial by maintaining minimum standards of performance by counsel.  Cal Code Civ. Proc. § 128 provides that a California court has the power to *inter alia* control, in furtherance of justice, the conduct of all persons connected with a judicial proceeding before it.  Given these citations, Petitioner appears to be arguing that the trial court violated his due process rights when it failed to address trial counsel's constitutionally inadequate performance.

The premise underlying this arguments is that the prosecutor's questioning of S. Doe constituted misconduct.  However, as discussed *supra*, the prosecutor did not engage in misconduct, and trial counsel was therefore not ineffective for failing to object or otherwise address the prosecutor's line of questioning or S. Doe's emotional testimony or departures from the stand.  It thus follows that the trial court's failure to limit S. Doe's testimony, prevent S. Doe from departing the stand, or issue an admonition regarding S. Doe's behavior did not violate Petitioner's due process rights.

In addition, permitting the jury to witness S. Doe's emotional behavior violated due process only if there were no permissible inferences that the jury could draw from it.  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).  As the trial court noted, the jurors could reasonably draw differing conclusions from S. Doe's emotional behavior, namely that the emotional behavior could both fortify her credibility and diminish her credibility.  And the jurors were instructed as to how to properly assess a witness' credibility, and are presumed to have followed the instructions.  Nothing in the record suggests that the jury drew impermissible conclusions from S. Doe's emotional behavior.

Finally, as also discussed *supra*, there was significant evidence of Petitioner's guilt.

The state court's rejection of this ineffective assistance of counsel claim was neither an unreasonable application of, or contrary to, Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Habeas relief is denied on this claim.

//

### 3. Denial of Request to Recall S. Doe for Defense Case

Petitioner argues that he was deprived of his due process right to present a complete

defense and to confront his accuser when the trial court refused to allow him to recall S. Doe for

his defense case.  Dkt. No. 17-2 at 9.

The California Court of Appeal denies this claim as follows:

***C. Refusal to Recall S. Doe to the Stand***
At the close of the prosecution's case-in-chief, Haqq's attorney made a motion to recall S.
Doe to testify for the defense. As justification for his request, he stated: "It's as much as a
strategical or tactical maneuver, if any, from my standpoint. We would like to think that
when she came back she'd tell the truth to the jury, and always have that undying hope that
would happen, and it would clearly give the jury another opportunity to see her. And
perhaps they too, may have additional questions for her prompted by the passage of time
and perhaps any questions that I would pose to her." Defense counsel also suggested that
S. Doe might be able to provide "helpful information" with respect to the charge that Haqq
kidnapped T. Doe for the purpose of rape, given the intervening testimony by Larkin that
the SART examination conducted on T. Doe revealed less extensive injuries than those
suffered by S.

The trial court denied defense counsel's request under Evidence Code, section 352 (section
352). Specifically, the court opined: "Well, again, [T. Doe] presented herself with [S. Doe]
to the rape trauma room and underwent a SART examination, which is consistent with her
account that she had been raped. She reported having been raped three times. I believe also
there was a tear to her hymen, indicating that she was a virgin at the time according to the
testimony of Ms. Larkin. I will note that—well, although I did not excuse [S. Doe] from
giving further testimony under 770 of the Evidence Code, that extrinsic evidence of her
statements including the evidence of her statements in the SART examination has been
received, including extrinsic evidence of all of her prior statements, and she was examined
exhaustively with regard to her prior statements such that she was given an opportunity to
explain or deny those statements, and in most instances, she did. Therefore, within the
provisions of 352 of the Evidence Code, I do not see that there is a sufficient showing as to
any relevance to further testimony which is not outweighed substantially by the undue
consumption of time. So the motion to recall [S. Doe] as a witness is denied." Haqq now
argues on appeal that the trial court's refusal to allow him to recall S. Doe as part of his
defense case was federal constitutional error, infringing both on his right to confront his
accuser and his right to present a complete defense. We disagree.

Although the Sixth Amendment right of confrontation "includes the right to cross-examine
adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide
latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on
such cross-examination.'" (*People v. Quartermain* (1997) 16 Cal.4th 600, 623–624
(*Quartermain* ); see also *People v. Paniagua* (2012) 209 Cal.App.4th 499, 525 (*Paniagua* )
["reasonable restriction of the right to cross-examine is consistent with the Sixth
Amendment"].) "In particular, notwithstanding the confrontation clause, a trial court may
restrict cross-examination of an adverse witness on the grounds stated in Evidence Code
section 352. [Citation.] A trial court's limitation on cross-examination pertaining to the
credibility of a witness does not violate the confrontation clause unless a reasonable jury
might have received a significantly different impression of the witness's credibility had the
excluded cross-examination been permitted. [Citations.]" (*Quartermain*, *supra*, 16 Cal.4th
at pp. 623–624.) Thus, "'[t]he Confrontation Clause guarantees an *opportunity* for
effective cross-examination, not cross-examination that is effective in whatever way, and

to whatever extent, the defense might wish.'" (*People v. King* (2010) 183 Cal.App.4th 1281, 1314.)

Similarly, while a criminal defendant has a federal constitutional right to present a defense, barring rare circumstances, "'application of the ordinary rules of evidence under state law does not violate [that right], because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial.'" (*People v. Andrade* (2015) 238 Cal.App.4th 1274, 1290; see also *People v. Abilez* (2007) 41 Cal.4th 472, 503 (*Abilez* ) [general rule gives way only in "extraordinary and unusual circumstances" where the exclusion of "crucial defense evidence" amounted to a denial of due process]; *People v. Snow* (2003) 30 Cal.4th 43, 90 (*Snow* ) ["[a]pplication of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense" unless evidence is of "such probative strength" that its exclusion violated the defendant's constitutional right].) Moreover, as a general matter, a trial court's exercise of discretion in excluding such evidence will not be overturned on appeal absent the showing of an abuse of discretion resulting in a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10; *People v. Raley* (1992) 2 Cal.4th 870, 895.)

Here, as discussed above, S. Doe provided lengthy testimony for the prosecution at trial, relating her recollection of the events of September 1998, explaining her reticence to further discuss the matter, and detailing the emotional rollercoaster that the incident created for both herself and her family. She was also subjected to extensive cross-examination by Haqq's trial counsel, highlighting the many inconsistencies in the various iterations of her story she gave over the years and stressing the fact that she was unable to identify Haqq as even being in the van on the day of the attack. Given these facts, defense counsel's "undying hope" that S. Doe might miraculously recant—finally telling "the truth"—if recalled to the stand was patently insufficient to justify bringing her back before the jury. Further, with respect to the intervening testimony from Larkin noting that T. Doe's injuries were less extensive than S. Doe's (presumably bolstering the argument that T. Doe was not kidnapped for the purposes of rape), this is information that, as the District Attorney properly points out, was available to the defense prior to trial in the two girls' SART examination reports. Under these circumstances, the trial court's decision refusing to recall S. Doe on grounds of relevance under section 352 was certainly not an abuse of discretion.

It follows that, because the additional cross-examination requested by Haqq was of marginal, if any, probative value, its exclusion did not take it outside of the general rule and implicate Haqq's constitutional right to present a defense. (*Snow*, *supra*, 30 Cal.4th at p. 90; see also *Abilez*, *supra*, 41 Cal.4th at p. 503 [trial court's exclusion of evidence was "a garden-variety evidentiary issue under state law and did not implicate defendant's federal constitutional right to present a defense"].) Further, since, as the trial court put it, S. Doe had already been "exhaustively" cross-examined by Haqq—in particular with respect to her many prior inconsistent statements—we see no basis for concluding that a reasonable jury might have received a significantly different impression of her credibility had the excluded cross-examination been permitted. (See *Quartermain*, *supra*, 16 Cal.4th at pp. 623–624; see also *Paniagua*, *supra,* 209 Cal.App.4th at p. 525 [no Sixth Amendment violation where the defendant was afforded "abundant opportunity" for cross-examination].) In sum, there was no constitutional error, let alone prejudicial constitutional error.  [FN 6]

> FN 6: Haqq also argues that the cumulative impact of the trial errors he raises deprived him of his constitutional right to a fair trial. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) However, as we have found no error, we additionally conclude that there

was no cumulative prejudice to Haqq. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1215 [rejecting argument that court committed cumulative error where there was "no error that, even in cumulation, was prejudicial"].)

*Haqq*, 2017 WL 1210013, at \*10–\*11.

### a.    Legal Standard

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth or Fourteenth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683 690 (1986)).  The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967). But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense."  *Id.* at 16.  Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." *Holmes*, 547 U.S. at 324 (internal citation and quotation marks omitted); *Michigan v. Lucas*, 500 U.S. 145, 151 (1991).  To determine whether the excluded evidence is relevant and material, and vital to the defense, the court may consider the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.  *See United States v. Stever*, 603 F.3d 747, 755-56 (9th Cir. 2010) (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)). A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict.  *See Lunbery v. Hornbeam*, 605 F.3d 754, 762 (9th Cir. 2010) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 19 (1967).  The Ninth Circuit has summarized the rule as "states may not impede a defendant's right to put on a defense by imposing mechanistic

(*Chambers*) or arbitrary (*Washington* and *Rock*) rules of evidence." *LaGrand v. Stewart*, 133 F.3d 1253, 1266 (9th Cir. 1998). The right to compulsory process is not absolute, however. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988). The Sixth Amendment right to present relevant testimony may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *See Rock*, 483 U.S. at 55. The Clause, for example, applies only to testimony that is both material and favorable to the defense. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 873 (1982).

**b.      Analysis**

Having carefully reviewed the record, the Court concludes that the state court's rejection of Petitioner's right to present a complete defense claim reasonably applied Supreme Court precedent and was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner has not pointed to anything in the record from which it can be reasonably inferred that if recalled to the stand, S. Doe would have provided new evidence that was relevant or exculpatory that could not have been elicited on cross-examination. As the trial court noted, the SART exam results for both S. Doe and T. Doe were available to defense counsel prior to trial, and, as discussed *supra*, DNA evidence established that Petitioner had engaged in sexual intercourse with S. Doe, and S. Doe's testimony and her SART exam results supported a finding that the sexual intercourse was nonconsensual. Petitioner has not established that the precluded re-examination would have yield relevant, material, or exculpatory evidence. The trial court's denial of Petitioner's request to recall S. Doe to testify as part of the defense case did not violate Petitioner's right to present a complete defense. *See Washington*, 388 U.S. at 16 (right to present complete is only implicated when evidence defendant seeks to admit is relevant, material, and vital to defense).

The Court also concludes that the state court's rejection of Petitioner's Confrontation Clause claim reasonably applied Supreme Court precedent and was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner argues that his right to confront S. Doe was violated when he was not allowed to recall her to the stand because she might finally recant her testimony and because he had not been

27

able to cross-examine her regarding the testimony by the physician's assistant as to the relative severity of the injuries suffered by S. Doe and T. Doe, which would be relevant to the kidnapping for the purpose of rape charge. However, the record indicates that S. Doe's testified at length on the stand and underwent extensive cross-examination, and that her testimony and cross-examination covered, in detail, her recollection of the relevant events, her affidavit in favor of Petitioner, her inability to identify to Petitioner, and her reluctance to testify. Petitioner's claim that S. Doe might have recanted her testimony as to consent is unsupported by the record. S. Doe's testimony was consistent regarding her lack of consent to the sexual activity. Because defense counsel was given wide latitude to cross-examine S. Doe, S. Doe's testimony was sufficient to allow the jury to assess her credibility and reliability, and Petitioner is only speculating as to the content and helpfulness of S. Doe's testimony if recalled to the stand, there was no Confrontation Clause violation. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) ("Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses . . ."); *Van Arsdall*, 475 U.S. at 680 (Confrontation Clause violated where reasonable jury might have received significantly different impression of witness' credibility had defense counsel been permitted to pursue his proposed line of cross-examination").

Habeas relief is denied on this claim.

**C.     Request for Evidentiary Hearing**

In his traverse, Petitioner argues that he is entitled to an evidentiary hearing because he developed the factual basis of his claims in state court; the state courts denied him the opportunity to develop the factual basis of his claims by failing to hold an evidentiary hearing; and because the state court made no findings of fact with respect to his constitutional claims.

Under AEDPA, the Court shall not hold an evidentiary hearing unless a petitioner shows that: (1) a claim relies on either a new rule of constitutional law made retroactive and previously unavailable, or a factual predicate that could not have been previously discovered through the exercise of due diligence; or (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the United States Supreme Court clarified the legal landscape as to evidentiary hearings under § 2254(e)(2) by holding that habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 180-81. The Supreme Court reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made" and that therefore the record under review must be "limited to the record in existence at that same time i.e., the record before the state court." *Id.* The Supreme Court held that this reading was "compelled" by the structure of AEDPA, which conveyed "Congress' intent to channel prisoners' claims first to the state courts." *Id.* at 182-83. It further held that "evidence introduced in federal court has no bearing on § 2254(d)(1) review" and that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 185. The Supreme Court noted that this construction did not render § 2254(e)(2) superfluous. *Id.* at 186-86. The Ninth Circuit has recognized that *Cullen* "effectively precludes federal evidentiary hearings" on claims adjudicated on the merits in state court. *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013); *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court has declined to decide whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied . . . an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks and citation omitted).

The Court DENIES Petitioner's request for an evidentiary hearing for the following reasons.

First, it is unclear why Petitioner seeks an evidentiary hearing. Petitioner has not identified any concrete and material factual conflict that would require the Court to hold an evidentiary hearing to resolve. *See* 28 U.S.C. § 2254(d)(2); *Earp v. Ornoski*, 431 F.3d 1158, 1166–67 (9th Cir. 2005).

Second, contrary to Petitioner's allegation, the state court addressed in a reasoned opinion the claims raised in the instant federal habeas petition. *See generally Haqq*, 2017 WL 1210013.

And, as explained *supra*, the state court's denial of these claims was neither an unreasonable application of, or contrary to, Supreme Court precedent, nor based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Accordingly, federal habeas review is limited to the record that was before the state court, and the Court cannot consider any evidence adduced in a federal evidentiary hearing. *See* 28 U.S.C. § 2254(d); *Pinholster*, 563 U.S. at 182-83 (when state court record precludes habeas relief under § 2254(d), district court not required to hold evidentiary hearing); *see also Schriro v. Landrigan*, 550 U.S. 465, 475 (9th Cir. 2007) ("If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.").

Petitioner's request for an evidentiary hearing is therefore DENIED.

### IV.  Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

//

//

//

## V. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  5/7/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge